STEVE L. KRASE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krase v. Commissioner
Docket No. 1546-71.
United States Tax Court
T.C. Memo 1976-62; 1976 Tax Ct. Memo LEXIS 342; 35 T.C.M. (CCH) 272; T.C.M. (RIA) 760062; March 4, 1976, Filed Steve L. Krase, pro se. [1]
Richard D. Hall, Jr. and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: *343 This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case was one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the male petitioners' employers (Lockheed Air Service Company and Dynalectron Corporation) and the United States Air Force, as well as the employment arrangements between field team members (such as those petitioners) and such employers. Respondent determined a deficiency in petitioner's 1969 Federal income tax in the amount of $677.83. The issue for decision is whether all or any portion of per diem payments received by petitioner in 1969 from Dynalectron Corporation (hereinafter, "Dynalectron") are includible in his gross income for that year under section 61(a)(1) of the Internal Revenue Code *344 of 1954; [2] and, if so, whether petitioner is entitled to deduct any or all of said amount as away-from-home traveling expenses under section 162(a)(2). FINDINGS OF FACT Petitioner filed his 1969 Federal income tax return with the Internal Revenue Service Center at Chamblee, Georgia. At the time of filing his petition, petitioner resided in Meridian, Mississippi. During 1969, petitioner was employed as a member of two different field teams by Dynalectron. That corporation as well as Lockheed Service Company (hereinafter, "Lockheed"), had a contract with the United States Air Force during 1969, to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the *345 first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his *346 actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government) -- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was *347 to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected filed team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling *348 the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such *349 employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of *350 the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments *351 made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner advised Dynalectron that his actual residence (fixed or permanent domicile) was at Rural Route 1, Norwich, Kansas. That is the home of his parents. Petitioner *352 had been born in Norwich in 1945 and was raised and educated in that community. He was in the Air Force from 1963 to 1967, and upon his discharge he returned to his parents' home to live. He remained at home and worked for his father and other farmers in the area until December of 1967 when he became employed by Cessna Aircraft Corporation at Wichita, Kansas. Petitioner continued to live at his parent's home while working for Cessna. On May 20, 1968, petitioner was hired by Dynalectron and was assigned to Sioux Falls, South Dakota. Petitioner remained at Sioux Falls until August 25, 1969, when he was transferred to Key Field at Meridian. Petitioner remained at Meridian throughout the remainder of the year 1969, and was still employed there at the time of trial in July 1972. Petitioner lived at Meridian while working for Dynalectron at Key Field, and he maintained a savings account in a bank there which he used to have funds available in case of emergencies. While so employed petitioner also maintained a bank account in Conway Springs, Kansas, near Norwich. He paid personal property taxes to Kingman County (where Norwich is located) on his automobile in 1969, as well as in the *353 preceding years, 1968 and 1967. He was registered with the Kingman County Selective Service Board. On his way from Sioux Falls to Meridian, petitioner left some of his personal belongings at his parents' home in Norwich, and picked up some of his clothes to take with him to Mississippi. Mail for petitioner addressed to him at his parent's home in Norwich was forwarded by them to him. The only occasions when petitioner was in Norwich during 1969 were when he stopped by for five days while en route from Sioux Falls to Meridian, and on certain three-day weekends. Petitioner received per diem payments from Dynalectron in 1969, in respect of his Sioux Falls and Meridian assignments in the respective amounts of $2,250 and $1,008, neither of which did he include in income on his 1969 return. Respondent determined, in his statutory notice of deficiency, that per diem payments in the total amount of $3,276 were includible in gross income under section 61. OPINION It must first be determined whether the per diem payments received by petitioner from Dynalectron are includible in his gross income for that year. It is believed that they are. In very broad and sweeping language, section *354 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in petitioner's income the per diem payments which he received in 1969. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4] The evidence establishes that the amount of such payments was $3,258, rather than $3,276 as determined by the respondent.
The question remains whether petitioner is entitled to deduct any part or all of the per diem payments under section *355 162(a)(2), as expenses for travel while away from home in pursuit of his trade or business as an employee of Dynalectron, Leo C. Cockrell, supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to deduct away-from-home expenses: The expense must be (1) reasonable and necessary traveling expense, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living *356 expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Two points are thus presented: Were petitioner's 1969 assignments at Sioux Falls and Meridian temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses? On the first point, it is believed that, considering the contractual arrangements between Dynalectron and the Air Force, as well as the employment arrangements between petitioner and Dynalectron -- both being described in the Findings of Fact -- both of those 1969 assignments should be regarded as temporary *357 rather than indefinite. Neither, it is believed, had sufficient duration to transform it into an indefinite one. On the second point, the evidence is not persuasive that petitioner maintained two places of abode and thereby incurred those additional and duplicate living expenses, the burden of which the deduction afforded by section 162(a)(2) is designed to mitigate. Petitioner worked, ate, slept -- in short, made his home -- at his job sites of Sioux Falls and Meridian and in those localities incurred his living expenses. He incurred no such expenses at Norwich, the place which he contends was his home, or at any place other than his two job sites. The conclusion is inescapable that petitioner was at, not away from, his home, for purposes of section 162(a)(2), when he was in Sioux Falls and Meridian. The result is that he should not be entitled to any deduction for away-from-home travel expenses under section 162(a)(2) for 1969. * * * * *
In accordance with the foregoing, Decision will be entered for respondent.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioner at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioner.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.